## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **KENNETH FINLEY** | : | |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | **3:12-CV-2194** |
| | : | **(JUDGE MARIANI)** |
| **PENNSYLVANIA DEPARTMENT OF** | : | |
| **CORRECTIONS**, et al. | : | |
| | : | |
| **Defendants** | : | |

## MEMORANDUM OPINION

### I. Introduction

On November 2, 2012, Plaintiff, Kenneth Finley, brought suit against the

Commonwealth of Pennsylvania, Department of Corrections, SCI Waymart and Captain

Patrick Herbert, individually and in his official capacity, and Superintendent Joseph Nish,

individually and in his official capacity, claiming that the Defendants discriminated against

him in violation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 (Count I); that

Defendants interfered with Plaintiff's right to leave under the Family and Medical Leave Act

("FMLA"), 29 U.S.C. § 2601, *et seq.*; and retaliated against him by disciplining him for

having taken leave which he alleges Defendants should have designated and treated as

protected leave under the FMLA (Count III). Plaintiff, in Count IV, alleges a violation by

Defendants of the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 951, *et seq.*

Plaintiff also argues that he was constructively discharged by the Commonwealth. (Compl., Doc. 1).

Before the Court is Defendants' Motion for Summary Judgment (Doc. 21) on all of Plaintiff's claims. For the reasons set forth below, the Court will grant in part and deny in part Defendants' motion.

## II. Statement of Undisputed Facts

The Defendants have submitted, pursuant to Middle District Local Rule 56.1, a Statement of Material Facts as to which they submit there is no issue to be tried. (Def's' Statement of Material Facts ("DSOF"), Doc. 22). The Plaintiffs have submitted a Response to Defendants' Statement of Material Facts. (Pl.'s Statement of Material Facts ("PSOF"), Doc. 30-2). Based on a review of the parties' submissions, the following facts, unless otherwise noted, are undisputed:

Plaintiff, Kenneth Finley, was hired by the Commonwealth of Pennsylvania, Department of Corrections, in or around 1991 as a Corrections Officer assigned to SCI Waymart. (DSOF, at ¶ 1; PSOF, at ¶ 1). The Defendant, Commonwealth of Pennsylvania, Department of Corrections, is an agency of the Commonwealth of Pennsylvania. (*Id.* at ¶ 2). Defendant, State Correctional Institution at Waymart ("SCI-Waymart) is a correctional institution operated by the Department, located in Waymart, PA. (*Id.* at ¶ 3).

Defendant, Patrick Herbert, was formerly employed by the Department at SCI-Waymart. He retired in 2012 with the rank of Captain. (*Id.* at ¶ 4).

Defendant, Joseph Nish, was formerly employed by the Department at SCI-Waymart as a Superintendent. He retired in 2011. (*Id.* at ¶ 5).

In 2007, Plaintiff Finley was promoted to the rank of Sergeant. (*Id.* at ¶ 6).

A Lieutenant is considered a management level employee and is no longer covered by the Union. Lieutenants are supervisors and do performance evaluations, assign and approve sick leave and vacation, and make the schedules for the running of the institution and enforce the policies and procedures of the institution. (DSOF, at ¶ 7; PSOF, at ¶ 7).

On January 28, 2011, Plaintiff Finley was working in the Control Center of the facility. (*Id.* at ¶ 8). The Control Center is a critical area because it covers the entire function of the institution. It is the security of the institution where inmate counts are conducted, line movements are controlled and those in the Control Center are responsible for the number of inmates at the jail. (*Id.* at ¶ 9).

Plaintiff Finley was working the six to two shift, as the Shift Lieutenant on January 28, 2011. (*Id.* at ¶ 10). As the Shift Lieutenant, Finley was charged with ensuring all officers get fed, the inmates go out to the yard, the meals get served, no inmates escape from the institution, and the overall orderly running of the institution on his shift. (*Id.* at ¶ 11).

It is undisputed that on January 28, 2011, Finley left work after telling Lt. Merkel "he was going home SPF." (DSOF, at ¶ 31; PSOF, at ¶ 31). The code SPF is used by the Department of Corrections as an acronym for "sick parental family" leave. (*Id.* at ¶ 33). Finley never returned from his SPF leave. (*Id.* at ¶ 95).

The circumstances surrounding Plaintiff Finley's departure from SCI-Waymart on January 28, 2011 are factually in dispute. The Defendants in paragraphs 14 through 23 of their Statement of Material Facts assert that Cpt. Herbert was conducting an investigation into an allegation of staff/inmate abuse that required that several staff members be relieved from their assignments to be interviewed. (DSOF, at ¶ 14). They further assert that when asked to arrange for these officers and sergeants to be relieved so that they could be interviewed, Finley resisted, arguing that he did not have enough staff to allow for the release of the officers who had been requested by Cpt. Herbert. Defendants assert that "Finley's voice was raised" and Cpt. Herbert felt he was being "difficult". (*Id*. at ¶ 19). Eventually, according to Defendants, Cpt. Herbert called Finley's Supervisor, Cpt. Mushensky, and informed him that "Finley was very unprofessional" and that Herbert needed two officers to leave for an interview. (*Id*. at ¶ 21).

Cpt. Mushensky then called Finley and Defendants assert that Finley, when asked what was going on, "explained the conversation and asked where Herbert wanted him to pull the officers from, "out of his ass?" (*Id*. at ¶ 22). Defendants assert that Cpt. Mushensky told Finley to get it done. (*Id*. at ¶ 23).

Finley disputes this account of his communications with Cpt. Herbert and Cpt. Mushensky. (PSOF, ¶¶ 14-23). Finley maintains that he asked Cpt. Herbert for advice, saying to him, "Captain, I don't have the parties to do it. I said you are a captain, I am a lieutenant. I am asking you for advice. Now what would you like me to do? How would you

4

like me to get this done?" (Id.). Finley further asserts that after asking Cpt. Herbert for guidance, Cpt. Herbert "became angry, started yelling 'well maybe I should just call your shift commander,'" to which Finley states he responded, "Well, maybe you should." (Id.). Finley further states that after being told by Cpt. Mushensky that "whatever Herbert wants, he needs to make it happen," he closed an entire housing unit within SCI-Waymart and locked all the inmates in their cells. After he ordered that done, he left one officer on the cellblock and relieved all the other officers requested by Herbert and told them to report to Cpt. Herbert and provide their interviews. (Id.).

Nonetheless, it is undisputed that Finley made the arrangements to get the officers relieved and they were relieved five minutes prior to their appointment time. (DSOF, at ¶ 24; PSOF, at ¶ 24). The Defendants and Plaintiff Finley agree that pulling officers from their posts is complicated and involves a safety factor. Any officer taken from their area has to be replaced with another which requires coordination and can be very stressful. (Id. at ¶ 27).

Lt. Merkel, after doing rounds, returned to the Control Center to relieve Finley for his meal and see if he needed any help. (Id. at ¶ 28). Finley was very upset and mad and informed Merkel of his phone calls with Cpts. Herbert and Mushensky. (Id. at ¶ 29). Lt. Merkel told Finley to take an hour or more to eat and do rounds. Finley said, "Thanks," and exited the control room. (Id. at ¶ 30).

As noted, 10 or 15 minutes later, Finley returned to the control room and told Merkel he was going home SPF. (Id. at ¶ 31).

The parties' dispute whether Lt. Merkel had authority to grant Finley leave to go home and further dispute whether he actually granted Finley leave to go home. (DSOF, at ¶ 32; PSOF, at ¶ 32).

It is further undisputed that when Cpt. Mushensky returned to the control room, Finley was no longer there. (*Id*. at ¶ 38).

Mushensky spoke with Lt. DeLucy, who was working in the control room, and DeLucy informed Mushensky that Finley had gone home. Mushensky reported Finley's absence to Major Kosciuk and filed an incident report with Major Kosciuk detailing what had occurred with Finley on the morning of January 28, 2011. (*Id*. at ¶¶ 39-41).

Cpt. Mushensky was not told that Finley was having a medical emergency or that he was having a panic attack. (*Id*. at ¶ 43). Cpt. Herbert learned later that morning that Finley had left the institution. (*Id*. at ¶ 44). Supt. Nish was also informed on January 28, 2011 that Finley had left the facility without proper authorization. (DSOF, at ¶ 45). Plaintiff's response to this paragraph is to characterize it as a "conclusion of law to which no response is required". (PSOF, at ¶ 45). While the question of whether Finley left the facility "without proper authorization" may be a conclusion of law, the statement that Supt. Nish was informed on January 28, 2011 that Finley had left the facility is not a conclusion of law and Plaintiff's failure to deny that assertion requires that it be deemed admitted. It is undisputed that Nish was never informed that Finley suffered any type of panic attack, anxiety attack or medical emergency. (DSOF, at ¶ 46; PSOF, at ¶ 46).

6

Major Kosciuk and Deputy Gavin informed Finley that he was suspended without pay although Supt. Nish never called Finley to discuss the incident. (*Id*. at ¶¶ 64-65).

Kosciuk and Gavin asked Finley "who authorized you to leave the institution?" Finley responded that Lt. Merkel did. Gavin and Kosciuk informed Finley that Capt. Mushensky had to be the one to give him authorization to leave. (*Id*. at ¶ 66).

Nish signed a certified letter to Finley indicating that he was suspended without pay and a fact finding would be conducted. (*Id*. at ¶ 69).

A fact finding is a review of the incident in which statements of various people are taken to determine what occurred. It is not an automatic indication of discipline or firing. (*Id*. at ¶ 70). The fact finding was scheduled for Wednesday, February 2, 2011, at 9:00 a.m. with Cpt. Herbert. (*Id*. at ¶ 71).

Finley did not attend the fact finding. (DSOF, at ¶ 86; PSOF, at ¶ 86).

When Finley did not attend the fact finding, Herbert called Finley at home. Finley told Herbert that he was off on SPF, and that if Herbert had any questions he could call Finley's attorney. Herbert responded, "Thank you, good-bye." (*Id*. at ¶¶ 87, 90).

Prior to January, 2011, Herbert had no knowledge that Finley was suffering from any medical condition. (*Id*. at ¶ 73).

On February 3, 2011, Supt. Nish sent Finley a letter that stated:

> This letter is to advise you that your Fact Finding Meeting with Cpt. Herbert, which was outlined in my letter to you on January 28, 2011, has been put on hold until you return to work from SPF leave. Once you return to work, we will proceed with our administrative action regarding your fact finding.

7

(Doc. 22-2; DSOF, at ¶ 94). The Plaintiff's response, although purporting to be a denial, states that the aforesaid letter "is a writing and that such speaks for itself." (PSOF, at ¶ 94). Again, the letter having been accurately quoted, Plaintiff has not properly denied paragraph 94 and, thus, it is deemed admitted.

The notice of suspension and fact finding issued to Finley noted three violations of the Department of Corrections Code of Ethics:

1.      Violation of the Department of Corrections Code of Ethics, Section B, No. 8 which states, "No employee shall leave his assigned post or leave the institution or grounds without being properly relieved and receiving proper authorization from a supervisor. Proper relief involves communicating any special observations or orders to the relief personnel."

2.      Violation of the Department of Corrections Code of Ethics, Section B, No. 9, which states, " Lawful orders by a supervisor to a subordinate must be executed promptly and faithfully by the subordinate even though the employee may question the wisdom of such order. The privilege of formally appealing the order may be done at a later date through either the supervisory command structure, civil appeal, or the grievance machinery."

3.      Violation of the Department of Corrections Code of Ethics, Section B, No. 21, which states, "An employee who knows that he/she will be unable to report for duty due to illness, emergency, or injury shall immediately notify his/her supervisor in accordance with their local policy, advising the supervisor of the nature of the injury, emergency or illness; and the expected date of return to duty.
          The Supervisor shall also be advised of a change in any condition which may occur after the original notification was given. An employee injured while on duty shall report such injury to his/her supervisor as soon as possible and shall comply with the provisions of existing regulations pertaining to such injuries. An employee who becomes ill while on duty and finds it necessary to be relieved from an assigned post or duty shall report this fact to his/her immediate supervisor and comply with #8 above."

(DSOF, at ¶ 77 (citing Finley Dep. at Ex. F-2)).  Plaintiff responds by stating "the code of ethics is a writing and as such speaks for itself."  (PSOF, at ¶ 77). The Notice of Suspension (Doc. 22-2) is properly quoted in the Defendants' Statement of Material and Undisputed Facts at paragraph 77 and the same is therefore deemed admitted.

The Code of Ethics is a document that all Department of Corrections employees receive and Finley recalls receiving a copy.  (DSOF, at ¶ 75, 76; PSOF, at ¶ 75, 76). Although, as previously noted, it is undisputed that Finley never returned from his SPF leave, the parties dispute whether Finley resigned his position with the Department of Corrections by retiring on February 17, 2011 at the recommendation of his psychiatrist (DSOF, at ¶ 96) or whether, as contended by Finley, he was "constructively discharged from his employment after the FMLA abuses . . . ."  (PSOF, at ¶ 96)

With respect to Finley's FMLA leave, it is undisputed that in June of 2010, he applied for FMLA leave for severe headaches which he thought were due to the alignment of his back.  (DSOF, at ¶ 47; PSOF, at ¶ 47).  A designation notice was processed by Maritza Evans, the SPF Coordinator at the Department's main office, for Kenneth Finley, approving him for leave under the FMLA for his own serious health condition for absences beginning July 3, 2010 through January 3, 2011.  (Id. at ¶ 48).

In September of 2010, Finley was diagnosed with an anxiety disorder.  (Id. at ¶ 49).

9

A Designation Notice is a notice approving an employee for medical leave for certain

timeframes and certain amounts of time. (*Id.* at ¶ 50). The Designation Notice authorizing

FMLA leave issued to Finley (Doc. 22-7) states:

> Your absence is approved and all leave taken for this reason through
> 01/03/11 will be designated as FMLA leave, provided you submit
> recertification, if indicated below.
>
> [x] You are required to provide recertification within 15 days following your
> first absence that occurs after 01/03/11.
>
> [x] if you have an absence due to this reason after 01/03/11 (the duration
> certified by the health care provider), you will be required to provide a request
> to extend the absence and new certification.
>
> [x] If you have an absence due to this reason after 01/03/11 (the end of your
> eligibility year), your eligibility will be remeasured and you will be required to
> provide new certification.

(Doc. 22-7). Defendants cite to the Designated Notice as evidence that Finley was required

to provide recertification within 15 days following his first absence that occurred after

January 3, 2011. (DSOF, at ¶ 51). Plaintiff responds to this paragraph by stating that the

"designation notice is a writing and as such speaks for itself." (PSOF, at ¶ 51). The

designation having been accurately cited for the proposition that Defendants advance, the

same is deemed admitted.

Throughout Finley's approved period of FMLA leave, he took approximately four or

five days off. (DSOF, at ¶ 53; PSOF, at ¶ 53).

After Finley left on the 28th of January stating that he was taking FMLA, he did not

submit anything to the Department until after they sent him a notice on February 4, 2011,

that he had 15 days to return paperwork on his FMLA leave. (*Id.* at ¶ 54). On February 4, 2011, Maritza Evans, the SPF Coordinator, sent an Additional Information Notice to Finley informing him that the January 28, 2011 absence exceeded the frequency and/or duration described by the healthcare provider and recertification would be necessary. (DSOF, ¶ 55; Doc. 22-7). Plaintiff's response to Defendants' paragraph 55 is that the "additional information notice is a writing and as such speaks for itself." (PSOF, at ¶ 55). This is not a proper denial of the issuance of the Additional Information Notice and the same is therefore deemed admitted.

Finley submitted an updated Serious Health Condition Certification from his physician, Satish K. Mallik, M.D., dated February 8, 2011. (DSOF, at ¶ 56; PSOF, at ¶ 56).

On February 23, 2011, an updated Designation Notice was issued reflecting that the January 28, 2011 absence was approved as FMLA/SPF Leave and leave taken for Finley's work related stress serious health condition through July 28, 2011 was also approved. (DSOF, at ¶ 57; Doc. 22-8). Plaintiff's response to Defendants' paragraph 57 states only that "the updated designation notice is a writing, and as such speaks for itself." (PSOF, at ¶ 57). The Designation Notice of February 23, 2013 is therefore admitted.

When a Designation Notice is issued, a copy is kept in the SPF Absence Coordinator File, one is sent to the employee, a copy goes to the facility Human Resource Office, and a copy is e-mailed to the employee's supervisor. (DSOF, at ¶ 58; PSOF, at ¶ 58).

The parties dispute whether Defendant Nish had knowledge that Finley had previously been out of work on FMLA leave but agree that Cpt. Mushensky, as Finley's Supervisor, was aware that Finley had used FMLA leave because of the leave code, but was not aware of what it was for. (*Id.* at ¶ 61).

Likewise, it is undisputed that Finley was never told he could not take SPF leave. (*Id.* at ¶ 62).

It is also undisputed that Finley did not require any changes to the job duties in order to perform the duties of a shift lieutenant, and he never asked the Department to alter the duties of a Shift Lieutenant to enable him to perform those duties. (*Id.* at ¶ 64).

### III. Standard of Review

Through summary adjudication, the court may dispose of those claims that do not present a "genuine issue as to any material fact." FED. R. CIV. P. 56(a). Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Turner v. Schering-Plough Corp.,* 901 F.2d 335, 340 (3d Cir. 1990). "As to materiality, . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). Therefore, the non-moving party may not oppose summary judgment simply on the basis of the pleadings, or on conclusory statements that a factual issue exists. *Anderson,* 477 U.S. at 248. Rather, the opposing party must point to a factual dispute requiring trial and the district court "may limit its review to the documents submitted for the purposes of summary judgment and those parts of the record specifically referenced therein." *Carmen v. San Francisco Unified Sch. Dist.,* 237 F.3d 1026, 1030-1031 (9th Cir. 2001); *see also Forsyth v. Barr,* 19 F.3d 1527, 1537 (5th Cir. 1994). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.,* 974 F.2d 1358, 1363 (3d Cir.1992), *cert. denied* 507 U.S. 912, 113 S.Ct. 1262, 122 L.Ed.2d 659 (1993).

## IV. Analysis

Defendants have moved for summary judgment on all four counts of Plaintiff's Complaint.

## Count I – Violation of Section 504 of the Rehabilitation Act of 1974

Here, the Defendants have moved for summary judgment, first asserting that the

individual Defendants may not have liability imposed upon them under the Rehabilitation Act

because they are not recipients of federal assistance (Defs.' Br. in Support of Mot. for

Summ. J., Doc. 27, at 3-4), and for the further reason that Plaintiff has failed to establish

that he suffers from a disability within the meaning of that term as used in the Rehabilitation

Act and set forth at 29 U.S.C. § 705(20) as follows:

Individual with a disability.

(A)     In general.
Except as otherwise provided in subparagraph (B), the term "individual with a
disability" means any individual who –
> (i) has a physical or mental impairment which for such individual
> constitutes or results in a substantial impediment to employment; and
> (ii) can benefit in terms of an employment outcome from vocational
> rehabilitation services provided pursuant to subchapter I, III, or VI [29
> U.S.C. §§ 720-751, 771-776, or 795-795n].

(B)     Certain programs; limitations on major life activities
Subject to subparagraphs (C), (D), (E), and (F), the term "individual with a
disability" means, for purposes of sections 701, 711, and 712 of this title, and
subchapters II, IV, V, and VII of this chapter, any person who has a disability
as defined in section 12102 of title 42.

The Rehabilitation Act thus defines an "individual with a disability" as someone "who

(1) has a physical or mental impairment that substantially limits his/her major life activities,

(2) has a record of such an impairment, or (3) is regarded as having such an impairment."

*Kania v. Potter*, 358 Fed.Appx. 338, 341 (3d Cir. 2009) (citing 29 U.S.C. § 705(20)(B); 42

U.S.C. § 12102(1)).

14

A "substantial limitation" is a significant restriction on a major life activity "as compared to ... the average person in the general population." *Toyota Motor Mfg., Ky., Inc. v. Williams,* 534 U.S. 184, 195-96, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002) (*quoting* 29 CFR § 1630.2(j) (2001)). A major life activity is one that is "of central importance to daily life," *id.* at 197, 122 S.Ct. 681, such as "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working," 29 C.F.R. § 1630.2(i), as well as "sitting, standing, lifting [and] reaching." *Kralik v. Durbin,* 130 F.3d 76, 78-79 (3d Cir.1997) (quoting 29 C.F.R. § 1630 app.)

*Id.*at 341-342.

In *Emerson v. Thiel College*, the Court of Appeals held that "Section 504 applies to federal financial assistance recipients." 296 F.3d 184, 190 (3d Cir. 2002) (citing *United States Dep't of Transp. v. Paralyzed Veterans of America,* 477 U.S. 597, 605-606, 106 S.Ct. 2705, 91 L.Ed.2d 494 (1986)). Accordingly, it held that the plaintiff failed to state a claim against the individual defendants under the Rehabilitation Act. "Because the individual defendants do not receive federal aid, Emerson does not state a claim against them under the Rehabilitation Act." *Id.* Emerson was followed in *A. W. v. Jersey City Public Schools,* observing again that "[s]uits may be brought pursuant to Section 504 against recipients of federal financial assistance, but not against individuals." 486 F.3d 791, 804 (3d Cir. 2007). *See also, Taylor v. Altoona Area Sch. Dist.,* 513 F.Supp.2d 540, 556 (W.D. Pa. 2007) ("The United States Court of Appeals for the Third Circuit has stated, in general terms, that individual liability is not available under the Rehabilitation Act. . . . Courts within this circuit have held that individuals cannot be held liable under the Rehabilitation Act") (internal citations omitted).

The Plaintiff provides no argument challenging the *Emerson* line of cases and, accordingly, summary judgment shall be granted to Defendants, Captain Patrick Herbert and Supt. Joseph Nish, on Plaintiff's Section 504 claim against them.

With respect to the Defendants' claim that the Plaintiff has failed to establish a genuine issue for trial as to whether he has a disability within the meaning of Section 504, Defendant, citing *Marinelli v. City of Erie,* 216 F.3d 354, 359 (3d Cir. 2000), argues that Finley "has failed to prove a *prima facie* case as he has not proved that he has a 'disability'." (Defs.' Br. In Support of Mot. for Summ. J., at 8).  However, Defendants fail to recognize that as the party moving for summary judgment, they are charged with making a showing sufficient to shift the evidentiary burden to the Plaintiff.

In *Celotex,* Justice Brennan explained how a party seeking summary judgment can establish its initial burden:

> The manner in which this showing can be made depends upon which party will bear the burden of persuasion on the challenged claim at trial. . . .  If the burden of persuasion at trial would be on the non-moving party, the party moving for summary judgment may satisfy Rule 56's burden of production in either of two ways. First, the moving party may submit affirmative evidence that negates an essential element of the nonmoving party's claim. Second, the moving party may demonstrate to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim. . . .
>
> Where the moving party adopts this second option and seeks summary judgment on the ground that the nonmoving party - who will bear the burden of persuasion at trial - has no evidence, the mechanics of discharging Rule 56's burden of production are somewhat trickier. Plainly, a conclusory assertion that the nonmoving party has no evidence is insufficient.  Such a "burden" of production is no burden at all and would simply permit summary

16

judgment procedure to be converted into a tool for harassment. Rather, . . . a party who moves for summary judgment on the ground that the nonmoving party has no evidence must affirmatively show the absence of evidence in the record. This may require the moving party to depose the nonmoving party's witnesses or to establish the inadequacy of documentary evidence. If there is literally no evidence in the record, the moving party may demonstrate this by reviewing for the court the admissions, interrogatories, and other exchanges between the parties that are in the record. Either way, however, the moving party must affirmatively demonstrate that there is no evidence in the record to support a judgment for the nonmoving party.

If the moving party has not fully discharged this initial burden of production, its motion for summary judgment must be denied, and the Court need not consider whether the moving party has met its ultimate burden of persuasion.

*Id.* at 330-332 (Brennan, J., dissenting) (internal citations and emphasis omitted).[1]

To discharge its "initial burden on summary judgment," the moving party must "identify those portions of the record demonstrating the absence of a genuine issue of material fact." *Cooper v. Hoover*, 2008 WL 341639, at *1 (M.D. Pa. 2008) (quoting Justice Brennan's dissent and referring to *Wisniewski* as "the Third Circuit's interpretation of *Celotex*"); *Wisniewski*, 812 F.2d at 84 n.2. "It is well established that a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, *and* identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Conoshenti v. Pub. Serv.*

---

[1] The Third Circuit Court of Appeals has found that Justice Brennan's dissent in *Celotex* "does not differ with the opinion of the Court regarding the appropriate standards for summary judgment." *In re Bressman*, 327 F.3d 229, 237 n.3 (3d Cir. 2003). In *Wisniewski v. Johns-Manville Corp.*, the Third Circuit also noted that Justice Brennan's dissent "agreed with the majority's articulation of the appropriate legal standard" for summary judgment and quoted it at length. 812 F.2d 81, 84 n.2 (3d Cir. 1987).

*Elec. & Gas Co.*, 364 F.3d 135, 145 (3d Cir. 2004) (emphasis added) (quoting *Celotex*, 477

U.S. at 323). In *Wisniewski*, the Third Circuit stated that Justice Brennan's dissent "further

explained the burden of the moving party" and quoted it at length. *Wisniewski*, 812 F.2d at

84 n.2.

> [A] party who moves for summary judgment on the ground that the
> nonmoving party has no evidence must affirmatively show the absence of
> evidence in the record. . . . This may require the moving party to depose the
> nonmoving party's witnesses or to establish the inadequacy of documentary
> evidence. If there is literally no evidence in the record, the moving party may
> demonstrate this by reviewing for the court the admissions, interrogatories
> and other exchanges between the parties that are in the record.

*Id.* (quoting *Celotex*, 477 U.S. at 332 (Brennan, J., dissenting)) (ellipses in *Wisniewski*).

In this matter, the Commonwealth has not come forward with any evidence to

establish the absence of a disability on the part of the Plaintiff. No medical testimony or

other medical evidence has been presented which would allow this Court to find as a matter

of law that the Plaintiff did not suffer from a psychiatric disorder which prevented him from

working so as to constitute a disability within the meaning of Section 504. Defendants have

failed to offer more than a conclusory assertion that Plaintiff, the nonmoving party who will

bear the burden of persuasion at trial, has no evidence to support his claim of a disability

within the meaning of Section 504. Nor have Defendants affirmatively showed the absence

of evidence in the record, or an inadequacy of documentary evidence, with respect to

Plaintiff's disability. Thus, Defendants have not fully discharged their initial burden of

production.

In *McDonald v. Commonwealth of Pennsylvania, Department of Public Welfare,* the Third Circuit acknowledged that "[w]hether suit is filed under the Rehabilitation Act or under the [ADA], the substantive standards for determining liability are the same." 62 F.3d 92, 95 (3d Cir. 1995) (citing *Myers v. Hose,* 50 F.3d 278, 281 (4th Cir. 1995)). Therefore, we analyze Plaintiff's discrimination claims according to the familiar burden shifting approach of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Stanziale v. Jargowsky,* 200 F.3d 101, 105 (3d Cir. 2000) ("The parties' burdens in establishing and defending claims [for discrimination] are determined by the procedure set forth in *McDonnell Douglas Corp. v. Green. . . .*"). "Under this approach, the plaintiff must first establish a prima facie case. The burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the discharge. If the defendant does so, the presumption of intentional discrimination disappears, but the plaintiff can still prevail by showing that the employer's proffered reason is merely a pretext for discrimination." *James v. Sutliff Saturn, Inc.,* 468 Fed.Appx. 118, 120 (3d Cir. 2012).

Defendant, however, has acknowledged as an undisputed fact that in September of 2010, Finley was diagnosed with an anxiety disorder. (DSOF, at ¶ 49; PSOF, at ¶ 49). Further, the Plaintiff testified at his deposition that in June of 2010 he applied for leave under the provisions of the FMLA because of "severe headaches". (Finley Dep., Doc. 30-4, 22:19-21). He further testified that after going to a chiropractor, he notified the State Employees Assistance Program who arranged for him to see Dr. Mallik. (*Id.* at 23: 3-14). He

19

was prescribed Celexa and Ativan and, by Finley's account, Dr. Mallik diagnosed him with a "psychiatric disorder". (*Id.* at 25:7-11).

When asked what his prognosis was for his "psychiatric disorder," Finley testified:

Hopefully that he is going to start weaning me off of that Celexa, because I haven't taken the Ativan. I haven't needed it, because I haven't been in pressure situations where people are harassing me. Once I remove – I was removed from that, I just – I just started to get better.

(*Id.* at 46:9-15)). Despite Finley's grant of FMLA leave for his stress or anxiety disorder, Finley testified that he might have taken four or five days off "total". (*Id.* at 47:15-20).

It is true that the Commonwealth has articulated a "legitimate non-discriminatory reason" for the adverse employment action taken against the Plaintiff, as it contends in its Brief. Specifically, it contends that Finley was suspended because he left work without first obtaining proper approval from a supervisor and that prior to his departure, he failed to promptly follow the orders of his supervisor regarding the movement of corrections officers. Nonetheless, under the *McDonnell Douglas* paradigm, the Plaintiff has come forward with sufficient evidence that the reasons offered are a pretext for unlawful discrimination, thus creating a genuine issue for trial. Plaintiff contends that when he left work, he informed Lt. Merkel that he was going home "SFP", the Department of Corrections' terminology for taking FMLA leave. Whether Finley's taking of leave was in fact the reason for his suspension rather than the reasons offered by the Commonwealth in support of its Motion for Summary Judgment, present issues for trial. Therefore, the Commonwealth's Motion for Summary Judgment with respect to Section 504 will be denied.

20

## Count II – Violations of FMLA, 29 U.S.C. §§ 2601, *et seq.*,
## and Count III – Violations of FMLA – Retaliation

Under the FMLA, an eligible employee is entitled to take leave for a "serious health

condition," which is defined as "an illness, injury, impairment, or physical or mental condition

that involves (A) inpatient care in a hospital, . . . or (B) continuing treatment by a health care

provider." 29 U.S.C. § 2611(11). In turn, "continuing treatment by a health care provider" is

defined as "a period of incapacity of more than three consecutive, full calendar days . . . that

also involves . . . [t]reatment by a health care provider on at least one occasion, which

results in a regimen of continuing treatment under the supervision of the health care

provider." 29 C.F.R. § 825.115(a)(2). Incapacity means the "inability to work, . . . or perform

other regular daily activities due to the serious health condition, treatment therefore, or

recovery therefrom." *Id.* § 825.113(b).

### Interference under the FMLA

Once an employee invokes his rights under the FMLA, an employer may not

"interfere with, restrain, or deny the exercise of or the attempt to exercise" these rights. 29

U.S.C. § 2615(a)(1). On an interference claim, a plaintiff "need not show that he was treated

differently than others. Further, the employer cannot justify its actions by establishing a

legitimate business purpose for its decision. An interference action is not about

discrimination, it is only about whether the employer provided the employee with the

entitlements guaranteed by the FMLA." *Callison v. City of Philadelphia*, 430 F.3d 117, 119-

120 (3d Cir. 2005). "[F]iring an employee for a valid request for FMLA leave may constitute

21

interference with the employee's FMLA rights as well as retaliation against the employee."

*Erdman v. Nationwide Ins. Co.*, 582 F.3d 500, 509 (3d Cir. 2009).

To invoke his FMLA rights, an employee must provide adequate notice of his need

for FMLA leave. 29 C.F.R. § 825.303. "When the approximate timing of the need for leave is

not foreseeable, an employee must provide notice to the employer as soon as practicable

under the facts and circumstances of the particular case." *Id*. § 825.303(a). He must

"provide sufficient information for an employer to reasonably determine whether the FMLA

may apply to the leave request." *Id*. § 825.303(b). "It is clear that an employee need not give

his employer a formal written request for anticipated leave." *Sarnowski v. Air Brooke*

*Limousine, Inc.*, 510 F.3d 398, 402 (3d Cir. 2007). Even when the leave is foreseeable, an

employee need provide only "verbal notice sufficient to make the employer aware that the

employee needs FMLA-qualifying leave, and the anticipated timing and duration of the

leave. . . . The employee need not expressly assert rights under the FMLA or even mention

the FMLA." 29 C.F.R. § 825.302(c). "While the FMLA does not require an employer to be

clairvoyant, this does not mean that employees need to provide every detail necessary for

the employer to verify if the FMLA applies." *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691

F.3d 294, 303 (3d Cir. 2012) (internal citations and quotation marks omitted).

> This conclusion is dictated by the language of 29 C.F.R. § 825.303(a), which
> provides that "where the employer does not have sufficient information about
> the reason for an employee's use of leave, the employer should inquire
> further of the employee . . . to ascertain whether leave is potentially FMLA-
> qualifying" (emphasis added). The regulations thus clearly envision situations

> where an employee can satisfy her notice obligation without providing enough detailed information for the employer to know if FMLA actually applies.

*Id.* Thus, "[i]n providing notice, the employee need not use any magic words." *Sarnowski,*

510 F.3d at 402.

> The critical question is how the information conveyed to the employer is reasonably interpreted. An employee who does not cite to the FMLA or provide the exact dates or duration of the leave requested nonetheless may have provided his employer with reasonably adequate information under the circumstances to understand that the employee seeks leave under the FMLA.

*Id.* "How the employee's notice is reasonably interpreted is generally a question of fact, not

law." *Lichtenstein,* 691 F.3d at 303.

The Plaintiff, when he left work on January 28, 2011, did not have approved FMLA

leave for that date, since the period of leave granted to him in the Designation Notice issued

in 2010 is stated as beginning July 3, 2010 and ending on January 3, 2011. However, that

document, in addition to stating that all leave taken for the Plaintiff's own serious health

condition through 1/03/11 will be designated as FMLA leave, also states: "You are required

to provide recertification within 15 days following your first absence that occurs after

1/03/11." (Doc. 22-7). The form further notified Plaintiff that if he had an absence after

1/03/11, he would be required to provide a request to extend the absence and new

certification, and that his eligibility would be "remeasured". (*Id.*).

As noted herein, the Plaintiff, on January 28, 2011, left work telling Lt. Merkel that he

"was going home SFP." (DSOF, ¶ 3, PSOF ¶ 3). The Plaintiff did provide recertification on

23

February 9, 2011 (Doc. 22-8), thereby complying with the 15-day recertification requirement in his original grant of FMLA leave.

The Defendant Commonwealth, by its Designation Notice of February 23, 2011 (Doc. 22-8), approved of the Plaintiff's absence on January 28, 2011 as FMLA covered and extended his leave period from January 3, 2011, the date of expiration of his prior FMLA leave period, to July 28, 2011. Thus, whatever defense the Commonwealth may wish to assert with respect to its claim that Finley did not give proper notice before leaving on January 28, 2011 cannot stand in the face of its retroactive approval of the Plaintiff's January 28, 2011 absence as FMLA protected. It would be incongruous indeed to find that Plaintiff's request for FMLA leave on January 28, 2011 was in some way defective, that he was otherwise ineligible for such leave or that his suspension for leaving on that date should be found lawful when the Commonwealth of Pennsylvania Department of Corrections approved his leave on that date by its February 23, 2011 Designation Notice.

Thus, the Defendants' Motion for Summary Judgment on Plaintiff's interference claim will be denied.

"It has long been established that, under the right circumstances, district courts are entitled to enter summary judgment *sua sponte*." *Gibson v. Mayor and Council of Wilmington,* 355 F.3d 215, 222 (3d Cir. 2004). The Court may not enter judgment, however, without "placing the adversarial party on notice that the court is considering a *sua sponte* summary judgment motion" and providing that party "an opportunity to present relevant

evidence in opposition to that motion." *Chambers Dev. Co. v. Passaic Cnty Util. Auth.*, 62

F.3d 582, 584 n. 5 (3d Cir. 1995). *See also*, *Otis Elevator Co. v. George Washington Hotel*

*Corp.*, 27 F.3d 903, 910 (3d Cir. 1994). Notice is satisfied if "the targeted party had reason

to believe the court might reach the issue and received a fair opportunity to put its best foot

forward." *Couden v. Duffy,* 446 F.3d 483, 500 (3d Cir. 2006) (citing *Gibson,* 355 F.3d at 223-

24). In *Gibson,* the plaintiff, a 10-year veteran of the Wilmington, Delaware Police

Department, appealed the District Court's *sua sponte* grant of summary judgment on the

grounds that the regulation pursuant to which he was discharged was "vague and

overbroad." The Court of Appeals affirmed the *sua sponte* grant of summary judgment by

the District Court to Wilmington, finding that the three conditions for doing so had been met:

(1) the point at issue was purely legal; (2) the record was fully developed; and (3) the failure

to give notice did not prejudice the party. 355 F.3d at 219.

> In so holding, the Court of Appeals observed:

> It has long been established that, under the right circumstances, district
> courts are entitled to enter summary judgment *sua sponte*. *See, Celotex
> Corp. v. Catrett,* 477 U.S. 317, 326, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).
> ("Our conclusion is bolstered by the fact that district courts are widely
> acknowledged to possess the power to enter summary judgments *sua
> sponte,* so long as the losing party was on notice that she had to come to
> forward with all of her evidence.").

*Id.* at 222.

In rejecting Gibson's contention that he had been taken "completely by surprise" by the District Court's ruling on the morning of the trial, the Court noted that Gibson had had the "full opportunity for discovery" and further emphasized:

> Indeed, Gibson had every opportunity to present his position to the Court, and it was he who moved for summary judgment on the issues of vagueness and overbreadth.

*Id.* at 223.

Further, the Court continued:

> In the context of *sua sponte* summary judgment, the First Circuit has defined "notice" to mean that "the targeted party 'had reason to believe the court might reach the issue and received a fair opportunity to put its best foot forward'". *Leyva On The Beach, Inc.,* 171 F.3d 717, 720 (1st Cir. 1999) (quoting *Jardines Bacata, Ltd. v. Diaz-Marquez,* 878 F.2d 1555, 1561 (1st Cir. 1989)). We agree. Given that it was Gibson who moved for summary judgment on the issues of vagueness and overbreadth, he certainly had the opportunity to put his "best foot forward."

*Id.* at 223-224.

Here, like the Plaintiff in *Gibson,* the Commonwealth "had clearly marshaled enough evidence to support [its] case and it was therefore not prejudiced by the lack of notice in the *sua sponte* grant of summary judgment", *id.* at 223. *See also, Kassbaum v. Steppenwolf Prods., Inc.,* 236 F.3d 487, 494 (9th Cir. 2000), *cert. denied,* 534 U.S. 815, 122 S.Ct. 41, 151 L.Ed.2d 13 (2001) ("When one party moves for summary judgment and at a hearing the record reveals no genuine dispute on a material fact, 'the overwhelming weight of authority supports the conclusion that . . . the court may sua sponte grant summary judgment to the non-moving party.'") (quoting *Cool Fuel, Inc. v. Connett,* 685 F.2d 309, 311 (9th Cir. 1982)).

In this case, the point at issue is purely legal, i.e., whether the Department of Corrections' grant of FMLA leave retroactively to include the date of January 28, 2011, the date when the Plaintiff left work, requires judgment to be entered as a matter of law in Plaintiff's favor. The record was fully developed, in particular as the documents which show the retroactive grant of FMLA leave to the Plaintiff are admitted as genuine and the failure to give notice here does not prejudice the Commonwealth since it had an opportunity to marshal the evidence in support of its claim that it should be granted summary judgment.

Summary judgment as to liability only shall therefore be entered in favor of the Plaintiff and against the Defendants on Plaintiff's FMLA interference claim. The remedies to which the Plaintiff may be entitled present issues for trial.

### Retaliation under FMLA

With respect to Plaintiff's retaliation claim under the FMLA, Plaintiff has shown that he took leave that the Commonwealth recognized as FMLA protected, and that in doing so, he was nonetheless suspended without pay or benefits from employment and that this adverse action of suspension was causally related to his January 28, 2011 departure from work.

The temporal connection here between Plaintiff's departure from work on January 28, 2011 for reasons which the Commonwealth determined to be FMLA-protected, and his suspension that day without pay or benefits, is sufficient to allow a reasonable jury to determine that the Plaintiff was retaliated against because he invoked his rights under the

FMLA on January 28, 2011. The letter of suspension offered as the reason for Plaintiff's

suspension his "failure in executing orders by [his] supervisor and for leaving [his] assigned

post without being properly relieved." (Doc. 30-9)

Issues, however, remain with respect to whether Superintendent Nish or Captain

Herbert knew or reasonably should have known of Plaintiff's FMLA right to recertification

under the terms of the prior Designation Notice (Doc. 22-7) for his absence on January 28,

2011, their intent in suspending him on that same date, and whether either made any

attempt to verify the Plaintiff's request and eligibility for FMLA leave.

Therefore, the Defendants' Motion for Summary Judgment on Plaintiff's retaliation

claim under the FMLA will be denied.

### Count IV – Violation of Pennsylvania Human Relations Act

Defendants, Department of Corrections and SCI-Waymart, as well as Defendants

Herbert and Nish, who have been sued in their official capacities, move for summary

judgment on Plaintiff's claims under the PHRA, contending that such claims are barred by

the Eleventh Amendment. Defendants argue that "[t]he PHRA does not subject

Pennsylvania to a suit in federal court," citing *Williams v. Pennsylvania State Police -*

*Bureau of Liquor Control Enforcement*, 108 F.Supp.2d 460, 465 (E.D. Pa. 2000). (Defs.' Br.

in Supp. of Mot. for Summ. J., at 5). In *Williams,* the plaintiff brought claims of discrimination

on the basis of race, sex and disability against the Bureau of Liquor Control Enforcement

28

and several individual defendants. The claims were brought pursuant to the PHRA. In

dismissing the Plaintiff's claims without prejudice, the Court in *Williams* explained:

> While the PHRA has been held to waive Pennsylvania's immunity from suit in
> state court, *see Mansfield State Coll. v. Kovich,* 46 Pa.Cmwlth. 399, 407 A.2d
> 1387, 1388 (1979), that waiver does not subject Pennsylvania to a PHRA suit
> in *federal* court, *see Irizarry v. Pennsylvania Dep't of Transp.,* No. 98-6180,
> 1999 U.S. Dist. LEXIS 5890, at *13 (E.D.Pa. Apr. 19, 1999); *McLaughlin v.
> State System of Higher Educ.,* No. 97-1144, 1999 U.S. Dist. LEXIS 4325, at
> *17 n. 4 (E.D.Pa. Mar. 31, 1999); *Fitzpatrick v. Pennsylvania,* 40 F.Supp.2d
> 631, 635 (E.D.Pa.1999). Indeed, Pennsylvania law, 42 Pa.C.S.A. § 8521(b),
> is quite explicit on this point: "Nothing contained in this subchapter shall be
> construed to waive the immunity of the Commonwealth from suit in Federal
> courts guaranteed by the Eleventh Amendment to the Constitution of the
> United States." Thus, a plaintiff may never pursue a PHRA claim against
> Pennsylvania or its agencies in federal court. For that reason, plaintiff's claims
> pursuant to the PHRA will be dismissed without prejudice.

*Williams,* 108 F.Supp.2d 465.

In *Pennhurst State School and Hospital v. Halderman,* the Supreme Court stated

that its decisions "thus establish that 'an unconsenting State is immune from suits brought in

federal courts by her own citizens as well as by citizens of another state.'" 465 U.S. 89, 100,

104 S.Ct. 900, 79 L.Ed.2d 67 (1984) (quoting *Employees v. Missouri Public Health &

Welfare Dep't,* 411 U.S. 279, 280, 93 S.Ct. 1614, 36 L.Ed.2d 251 (1973)). The Court added

that "[i]t is clear, of course, that in the absence of consent a suit in which the State or one of

its agencies or departments is named as a defendant is proscribed by the Eleventh

Amendment. *See, e.g., Florida Department of Health v. Florida Nursing Home Ass'n,* 450

U.S. 147, 101 S.Ct. 1032, 67 L.Ed.2d 132 (1981) (*per curiam); Alabama v. Pugh,* 438 U.S.

781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978) (*per curiam).*" *Id.*

29

The Court in *Pennhurst* also noted that "[t]he Eleventh Amendment bars a suit against state officials when the state is the real, substantial party in interest." *Id.* at 101 (internal quotation marks omitted). Thus, "the general rule is that relief sought nominally against an officer is in fact against the sovereign if the decree would operate against the latter. *Hawaii v. Gordon*, 373 U.S. 57, 58, 83 S.Ct. 1052, 1053, 10 L.Ed.2d 191 (1963) (*per curiam*). And, as when the State itself is named as the defendant, a suit against state officials that is in fact a suit against a State is barred regardless of whether it seeks damages or injunctive relief. *See, Cory v. White,* 457 U.S. 85, 91, 102 S.Ct. 2325, 2329, 72 L.Ed.2d 694 (1982)." *Id.* at 101-102.

Here, Plaintiff does not present any argument opposing the Defendants' Motion for Summary Judgment with respect to Plaintiff's claims under the PHRA for the reasons stated above. Because Plaintiff's claims brought under the PHRA fail as a matter of law, summary judgment will be entered against the Plaintiff with respect to Count IV and in favor of the Defendants.

## Plaintiff's Constructive Discharge Claim

Defendants seek summary judgment on Plaintiff's claim that he was constructively discharged. Plaintiff, relying upon *Duffy v. Paper Magic Group, Inc.*, 265 F.3d 163 (3d Cir. 2001) and *Levendos v. Stern Entertainment,* 860 F.2d 1227 (3d Cir. 1988), argues that "Plaintiff was expressly ordered by his physician to resign his job in order to preserve his health. This is not a situation where Plaintiff, couldn't handle things or felt resignations [*sic*]

was the best decision. Finley resigned based on Dr. Mallik's orders. He was compelled and had no choice but to resign in order to preserve his health." (Pl's Br. in Opp. to Defs.' Mot. for Summ. J., Doc. 30-1, at 13-14).

Defendants maintain that Finley has failed to meet the test set forth in *Duffy v. Paper Magic Group, Inc., supra,* and that his statement that he resigned upon the advice of his psychiatrist is insufficient to establish an issue for trial. Defendants argue that Finley "has failed to allege any ongoing circumstances that were so unpleasant that they would have led a reasonable person to feel compelled to resign." (Defs.' Br. in Supp. of Mot. for Summ. J., at 17).

In several cases, this Circuit has determined the elements necessary to show a constructive discharge. In *Clowes v. Allegheny Hospital,* 991 F.2d 1159 (3d Cir. 1993), after a jury had found that Clowes had been constructively discharged and that age had been a determinative factor, the District Court entered judgment for Clowes and denied the Hospital's motion for judgment notwithstanding the verdict or for a new trial. On appeal, the Circuit reversed the District Court, finding that the evidence was insufficient to sustain the jury's verdict. In so ruling, the Court first stated: "[w]e employ an objective test in determining whether an employee was constructively discharged from employment: whether the conduct complained of would have the foreseeable result that working conditions would be so unpleasant or difficult that a reasonable person in the employee's shoes would resign." *Clowes,* 991 F.2d at 1161 (internal quotation marks omitted).

31

The Court noted that Clowes "was never threatened with discharge; nor did her employer ever urge or suggest that she resign or retire." *Id.* It further noted that Clowes' employer "did not demote her or reduce her pay or benefits." *Id.* Nor was Clowes involuntarily transferred to a less desirable position or her job responsibilities altered in any way. *Id.* She was not given any unsatisfactory evaluations and, instead, received ratings of "fair." *Id.* Further, the Court stated:

> It is also highly significant that Clowes, prior to leaving her position with the hospital, never requested to be transferred to another position, never advised the hospital that she would feel compelled to leave if changes regarding the manner in which she was being supervised were not made, and did not even attempt to file a grievance until long after she had stopped working at the hospital. As other courts of appeals have noted, a reasonable employee will usually explore such alternative avenues thoroughly before coming to the conclusion that resignation is the only option. *Boze v. Branstetter*, 912 F.2d 801, 805 (5th Cir.1990); *Garner v. Wal-Mart Stores, Inc.*, 807 F.2d 1536, 1539 (11th Cir.1987).

*Id.* at 1161-1162.

The Court expressed its view that Clowes's complaints focused exclusively on "allegedly overzealous supervision of her work." *Clowes*, 991 F.2d at 1162. To this, the Court noted:

> Clowes has not brought to our attention a single case in which a constructive discharge has been found based solely upon such supervision. While we do not hold that an employer's imposition of unreasonably exacting standards of job performance may never amount to a constructive discharge, we are convinced that a constructive discharge claim based solely on evidence of close supervision of job performance must be critically examined so that the ADEA is not improperly used as a means of thwarting an employer's nondiscriminatory efforts to insist on high standards.

32

*Id.*

In this case, the record is clear that Finley was never threatened with discharge; nor did his employer ever urge or suggest that he resign or retire. Likewise, Finley was not demoted and did not have his pay or benefits reduced. Nor was he involuntarily transferred to a less desirable position and his job responsibilities were not altered in any way. Like the Plaintiff in *Clowes*, Finley was never given unsatisfactory job evaluations.

*Levendos v. Stern Entertainment, Inc.*, also cited by Plaintiff, is distinguishable from the case before this Court. There, the Court found the plaintiff's factual allegations sufficient to survive her employer's motion for summary judgment:

> We emphasize that the fact-finder must assess the veracity and weight of Levendos's various factual allegations. While we can imagine a maitre'd who might not object to exclusion from management meetings, denial of authority to order supplies, false accusations of stealing from and drinking on the job, and who might not be disturbed by rumors and remarks that she would be replaced by a male, her employer's refusal to talk with her, and to find wine bottles in her locker, we find these events are clearly not trivial.

*Levendos*, 860 F.2d at 1231.

Further, the Court declined to characterize the case as a "single incident" case, thus rendering inapplicable those decisions which require the Plaintiff to demonstrate more than a single discriminatory incident in the workplace. *Id.* at 1232. *See e.g.*, *Watson v. Nationwide Ins. Co.*, 823 F.2d 360, 361 (9th Cir. 1987).

In *Duffy, supra*, a decision cited by both Plaintiff and Defendants, the Third Circuit stated that "[w]e employ an objective test to determine whether an employee can recover on

a claim of constructive discharge. Specifically, a court must determine 'whether a

reasonable jury could find that the employer permitted conditions so unpleasant or difficult

that a reasonable person would have felt compelled to resign.'" 265 F.3d at 167 (quoting

*Connors v. Chrysler Fin. Corp.,* 160 F.3d 971, 974 (3d Cir.1998)) (internal citation and

brackets omitted). In *Duffy,* the Plaintiff claimed that she was constructively discharged

because she experienced a "'continuous pattern of discriminatory treatment' at Paper

Magic." *Id.* The Plaintiff contended that she was not considered for a promotion to manager

of the customer service/order processing department because of her age; that her

department was consistently understaffed and management delayed in provided needed

assistance; her supervisors made negative remarks about her age; she was excluded from

a training seminar for manager; she was removed from work-related committees; she was

prevented from participating in the hiring process for the order processing department,

although she was the supervisor; other employees in the department failed to cooperate

with her; she was the only supervisor in the company given a weekly "report card"; Human

Resources reprimanded her for failing to participate in company events; and other salaried

employees were paid for overtime while she was not. *Id.* at 167-168. Citing its prior

decisions in *Aman v. Cort Furniture Rental Corp.,* 85 F.3d 1074 (3d Cir. 1996) and

*Levendos v. Stern Entertainment, supra,* as presenting cases similar to the case of the

plaintiff in *Duffy,* in that those cases concerned "a pattern of conduct rather than an isolated

incident," the Court nonetheless determined that "the situation does not reach the threshold

34

of 'intolerable conditions.'" *Id.* at 169. Thus, the Court, in affirming the District Court's grant

of summary judgment, reasoned:

> Although certainly stressful and frustrating, the alleged conduct would not
> compel a reasonable person to resign. For example, in contrast to the
> changing duties of the plaintiffs in *Aman*, Duffy's tasks remained the same
> while she was the Supervisor of Order Processing. She was never assigned
> degrading or menial tasks and she consistently received pay increases during
> her employment. Duffy does allege that her department was understaffed and
> that management deliberately delayed providing needed assistance, thereby
> making her job more difficult. Duffy's job, however, did not become impossible
> as a result of these staff shortages. Rather, the shortages simply required her
> to work longer hours until help arrived. This made her job more stressful, but
> not unbearable. *See Conners,* 160 F.3d at 975 ("[E]mployees are not
> guaranteed stress-free environments and discrimination laws cannot be
> transformed into a palliative for every workplace grievance, real or imagined,
> by the simple expedient of quitting.").

*Id.*

Further, and of significance in this case, the Court in *Duffy* rejected Duffy's attempt to

assert her physician's opinion that her job had a sufficiently adverse effect upon her health

to render her working conditions intolerable. Specifically, the Court's words, which have

complete application to the case before this Court, are as follows:

> Duffy's attempt to use her physician's opinion that her job had an adverse
> affect upon her health to prove that her working conditions were intolerable
> also fails. These health problems support an inference that Duffy's
> environment was stressful. However, as noted above, a stressful environment
> does not amount to constructive discharge.

*Duffy,* 265 F.3d at 170.

In this case, Finley has not produced evidence from which a reasonable jury could

find that he was constructively discharged. Finley testified at his deposition that his last day

of work at SCI-Waymart was February 17, 2011. (Finley Dep., at 12:14). He testified that he

was under a psychiatrist's care and that he "was having a terrible time dealing with the

stress of the job. And then people at work on the day in question put me under a great deal

of stress that I just couldn't take it any longer." (*Id.* at 12:17-24).

When asked the nature of his separation, Finley answered, "I retired." (*Id.* at 12:25-

13-2). He described the incident of January 28, 2011 in which he received a telephone call

from Lt. Smith, on behalf of Cpt. Herbert, wherein he was told that he needed "several

officers and two sergeants relieved, because Captain Herbert wanted to talk to them." (*Id.* at

14:7-11).

Finley testified that he told Lt. Smith that he "just [did not] have the people" which, in

turn, generated a call from Cpt. Herbert, who asked Finley, "what part of this don't you

understand? I need these guys relieved." (*Id.* at 14:12-19).

When Finley protested, "Captain, I don't have the bodies to do it," he testified that

Cpt. Herbert became angry and "started yelling, well, maybe I should just call your -- the

shift commander." (*Id.* at 14:17-25).

Finley then testified within two rninutes he received a phone call from Cpt.

Mushensky, who told him "whatever Herbert wants, make it happen." (Finley Dep., at 15:1-

3).

Finley stated he then "had no other choice," wound up closing a housing unit and

"we did get them out there for five minutes prior to their appointment time." (*Id.* at 15:4-11).

When asked what happened after he sent the officer as directed, he stated:

I got fired up. I was like why are they doing this to me? I'm still trying to hire overtime to get enough guys on the shift, and they're pulling more off. It just made absolutely no sense at all. And I could feel that my blood pressure was going up, and I was starting to get really shaky, and that's when he finally said to me, hornie, you've got to get out of here.

(*Id.* at 19:22-20:3).

It was at that time that Finley left SCI-Waymart, never to return. He testified that when he arrived at home, his wife took his blood pressure which was "like 170 over 120." (*Id.* at 27:15-17).

He testified that on the same day he received a phone call from Major Kosciuk and Deputy Gavin, in which, after inquiry was made by them as to who authorized him to leave, he was suspended without pay and benefits and told he would be scheduled for a fact-finding hearing. (*Id.* at 27:15-28:9). He testified he then sent a letter of resignation (Doc. 30-11) dated February 11, 2011. The letter states: "Please be advised that as of February 19, 2011, I am resigning from my position as Correctional Officer III."

Finley admitted that he had never been disciplined prior to January 28, 2011, with the exception of a letter of reprimand "back in the '90s." (Finley Dep., at 44:25-45:3).

Further, Finley testified that he never asked his employer to alter the job duties of a shift lieutenant to enable him to be able to perform those duties. (*Id.* at 45:15-18). When asked whether he needed any changes in the job duties in order to be a shift lieutenant,

Finley answered: "I didn't think so. My evaluations were saying that I was doing a good job." (*Id.* at 45:19-22).

On the record evidence, Finley has failed to establish a genuine issue for trial as to whether he was constructively discharged and the Defendants are entitled to judgment in their favor as a matter of law. The record shows that the Commonwealth, at SCI-Waymart, never threatened to fire Finley, never encouraged him to resign from his position, never involuntarily transferred him to a less desirable position and, by his own admission, he received evaluations that he was doing a "good job." Nor was there evidence that Finley requested a transfer within the Department of Corrections. Thus, Finley has failed to demonstrate any of the factors listed in *Clowes, supra,* at 1161. Nor is there evidence that Finley has been "subjected to a continuous pattern of harassment and that his employer did nothing to stop it." *Aman*, 85 F.3d at 1084-1085. Here, Finley was not continuously subjected to discriminatory insults or false accusations of wrongdoing or incompetence. He was not disciplined and received only a single letter of reprimand some time in the 1990s, which he testified was the subject of a grievance which resulted in the removal of the letter from his file. Indeed, it appears that Finley worked at his job as a sergeant and then as a lieutenant without incident and without complaint. The record does not contain evidence from which a fact finder could infer that the conditions at SCI-Waymart were so intolerable that a corrections officer having the rank of lieutenant and possessing reasonable sensitivity would be forced to resign. *See Levendos,* 860 F.2d at 1231.

Instead, it appears that a single incident on January 28, 2011 presents the catalyst

for the Plaintiff's decision to resign, although it cannot be gainsaid that the Plaintiff worked in

a stressful environment. This, however, is insufficient under the case law cited herein to

permit Plaintiff to issue a letter of retirement and then, subsequently, claim he was

constructively discharged. This is particularly the case given Finley's attempt to use what he

terms his psychiatrist's "advice" that "it would be detrimental if I went back into that

atmosphere, because I could not -- no longer trust the people that I worked with." (Finley

Dep., at 13:12-16). As in *Duffy,* this attempt to use his psychiatrist's advice to prove that his

working conditions were intolerable fails. Finley's health problems, while supporting an

inference that his work environment was stressful, do not provide a basis for a claim of

constructive discharge.

For these reasons, summary judgment will be granted in favor of Defendants and

against Plaintiff on his claim of constructive discharge.

### Qualified Immunity

"The doctrine of qualified immunity protects government officials 'from liability for

civil damages insofar as their conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known.'" *Pearson v.*

*Callahan,* 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (quoting *Harlow v.*

*Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). Qualified immunity

serves the dual purpose of holding government officials accountable when their power is

exercised unreasonably and protecting those officials from "harassment, distraction, and liability when they perform their duties reasonably." *See id.* "Qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" *Id.* (citing *Groh v. Ramirez*, 540 U.S. 551, 567, 124 S.Ct. 1284, 157 L.Ed.2d 1068 (2004) (Kennedy, J., dissenting)).

Qualified immunity is "an immunity from suit rather than a mere defense to liability . . . it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985) (emphasis deleted). The qualified immunity doctrine serves to eliminate "insubstantial claims" prior to discovery. *Pearson*, 555 U.S. at 231 (citing *Anderson v. Creighton*, 483 U.S. 635, 640 n. 2, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). The Supreme Court has "stressed the importance of resolving immunity questions at the earliest possible stages in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (*per curiam*).

In *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), the Supreme Court articulated a two-step test to determine the appropriate application of qualified immunity. A court must decide: (1) whether the facts alleged by the plaintiff violate a constitutional right; and (2) if so, whether that right was "clearly established" at the time of the alleged violation. *Saucier*, 533 U.S. at 201. Qualified immunity attaches unless the official's conduct violated such a clearly established right. *Anderson*, 483 U.S. at 640. However, the *Saucier* procedure, which erected a rigid framework, no longer mandates that

40

district courts decide the two prongs in any particular order. *Pearson*, 555 U.S. at 236. The decision is left to the discretion of the district court. *Id.*

The Defendants argue that they "had no reason to believe that by disciplining Finley for aborting his post without proper leave, coverage or authorization, that they would be violating Finley's rights. Nish and Herbert were unaware that Finley had previously taken FMLA leave or that his reason for leaving the institution on January 28, 2011 was related to a medical condition." (Defs.' Br. in Supp. of Mot. for Summ. J., at 18). The individual defendants seeking qualified immunity cite to paragraphs 46, 73, and 74 of the Statement of Undisputed Facts. Paragraph 46, admitted by the plaintiff, states, "Nish was never informed that Mr. Finley suffered any type of panic attack, anxiety attack, or medical emergency." Paragraphs 73 and 74, also admitted by the plaintiff, state that "[p]rior to January 2011, Herbert had no knowledge that Finley was suffering from any medical condition," and that "[a]s of the date of his deposition, Herbert had no knowledge of Finley's medical condition or any mental illness." (DSOF, ¶¶ 46, 73-74; PSOF, ¶¶ 46, 73-74).

These admissions, however, do not establish that Finley's right to FMLA leave was not clearly established when he left work on January 28, 2011, telling Lt. Merkel that he "was going home SPF." (DSOF, ¶ 31; PSOF ¶ 31).

Such lack of knowledge on the part of Cpt. Herbert and Supt. Nish does not allow for the conclusion that Finley's right to leave work for an FMLA-protected reason was not

clearly established. The Department of Labor Regulations implementing the FMLA provided

at 29 C.F.R. § 825.303(b) provides in part:

> (b)  Content of notice. An employee shall provide sufficient information for an
> employer to reasonably determine whether the FMLA may apply to the leave
> request. Depending on the situation, such information may include that a
> condition renders the employee unable to perform the functions of the job. . . .
> When an employee seeks leave for the first time for a FMLA-qualifying
> reason, the employee need not expressly assert rights under the FMLA or
> even mention the FMLA. When an employee seeks leave due to a qualifying
> reason, for which the employer has previously provided the employee FMLA-
> protected leave, the employee must specifically reference either the qualifying
> reason for leave or the need for FMLA leave. . . . *The employer will be*
> *expected to obtain any additional required information through informal*
> *means.* An employee has an obligation to respond to an employer's questions
> designed to determine whether an absence is potentially FMLA-qualifying.
> Failure to respond to reasonable employer inquiries regarding the leave
> request may result in denial of FMLA protection if the employer is unable to
> determine whether the leave is FMLA-qualifying.[2]

(Italics added).

In this case, the Department of Corrections had previously provided Finley with

FMLA-protected leave and, on January 28, 2011, he specifically referenced the need for

FMLA leave by saying he was "going home SFP." At that juncture, Section 825.303(b)

places an obligation on the employer to "obtain any additional required information through

informal means." Neither Cpt. Herbert nor Supt. Nish did so. Instead, Supt. Nish sent Finley

---

[2] The Court notes that Section 825.303(c) requires that when the need for leave is not foreseeable, "an employee must comply with the employer's usual and customary notice and procedural requirements for requesting leave, absent unusual circumstances. For example, an employer may require employees to call a designated number or a specific individual to request leave." Here, whether Finley's notification to Lt. Merkel that he was "going home SFP" was contrary to the Department of Corrections policy with respect to the identity of the person to whom Finley was to give notice of his need for FMLA leave, has been waived

42

a letter on that same date notifying Finley that he was "being suspended without pay, without benefits pending investigation from your position as Corrections Officer 3, Civil Service status at SCI-Waymart effective the close of business on January 28, 2011. This action is being taken because of your failure in executing orders by your supervisor and for leaving your assigned post without being properly relieved." (Doc. 30-9). Clearly, no effort was made to ascertain whether Finley, having been previously granted FMLA leave for his anxiety disorder (Doc. 30-10), was entitled under its terms to acquire new certification for any absence after January 3, 2011.

In *Hayduk v. City of Johnstown,* the Court found that the plaintiff had provided enough information at the due process hearings conducted in that case "to have made it clear to a reasonable official in Silka's [Defendant's City Manager] position that the official had a duty to inform Plaintiff of his rights and obligations under the FMLA and to inquire further if he had any questions about Plaintiff's eligibility. Silka has no immunity in Plaintiff's wrongful termination action to the extent that he based his decision to fire Plaintiff on the August 29 and September 5 absences." 580 F.Supp.2d 429, 480 (W.D. Pa. 2008), *aff'd* 386 Fed.Appx. 55 (3d Cir. 2010). Here, the individual Defendants had a duty to inquire further with respect to Plaintiff's eligibility for FMLA leave before immediately suspending him on January 28, 2011 after he informed Lt. Merkel that he was "going home SFP." Qualified immunity, therefore, is denied to the individual Defendants.

---

by the Commonwealth's grant of FMLA leave to Finley retroactive to January 28, 2011, the date of his

In *Haybarger v. Lawrence County Adult Probation and Parole,* the Court held "on an issue of first impression in our Court that a supervisor in a public agency may be subject to individual liability under the FMLA." 667 F.3d 408, 410 (3d Cir. 2012). Accordingly, to the extent that Defendants Herbert and Nish are sued in their individual capacities as supervisors of a public agency, their status necessitates the qualified immunity analysis above and qualified immunity is denied for the reasons stated.

## Conclusion

Defendants' Motion for Summary Judgment (Doc. 21) will therefore be granted in part and denied in part.

A separate Order follows.

Robert D. Mariani
United States District Judge

---

departure from work. (*See* Doc. 22-8).